| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cr-69-HSM-SKL |
| | ) | |
| RANDALL SCOTT ROUNSAVILLE, | ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT & RECOMMENDATION**

Before the Court is a motion by Defendant Randall Scott Rounsaville ("Defendant"), seeking to suppress the search of his house and the statement he gave two days later, which was filed along with a supporting memorandum [Docs. 283, 285].[1]   Plaintiff United States of America ("the Government") filed a response in opposition to the motion [Doc. 296].   The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b) [Doc. 286]. An evidentiary hearing on the motion was held on June 12, 2018.   The Government timely filed a post-hearing brief on July 3, 2018 [Doc. 320], and Defendant timely filed a post-hearing brief on July 10, 2018 [Doc. 325].   The time for any reply expired on July 17, 2018, so this matter is now ripe.

For the reason addressed below, I **RECOMMEND** that Defendant's motion to suppress be denied even though I conclude a Fourth Amendment violation has occurred.

---

[1] Defendant also filed a motion to suppress his post-arrest statement with supporting memoranda [Docs. 281, 282], but this motion was abandoned at the hearing so it was stricken [Doc. 303]. Defendant continues to assert his statement is the fruit of an unlawful search and that argument is addressed herein.

# I.    FACTUAL BACKGROUND

The government called Officer Greg Cross ("Cross"), a six-year veteran of the Fort Oglethorpe Police Department assigned for almost five years to the Lookout Mountain (Ga.) Judicial Circuit Drug Task Force, which is a drug task force comprised of multiple city and county police and sheriff's departments ("Task Force").   Cross was the sole witness presented during the evidentiary hearing.   Pertinent facts are summarized below.

On January 25, 2017, Cross and other officers of the Task Force served an unrelated search warrant as part of an investigation into the distribution of methamphetamine in Georgia. During the execution of this unrelated search warrant, "ICE" methamphetamine was found.   The man found with the ICE methamphetamine ("the Informant") provided information to Cross.   The Informant told Cross that he had purchased the ICE methamphetamine found in his home from Defendant at Defendant's house.   The Informant traveled with Cross to physically show Cross where Defendant lived that same day.   Cross had no information about the veracity or reliability of the Informant.   Instead, Cross knew the Informant was arrested with methamphetamine and identified Defendant as his source and Defendant's house as the location where he obtained the methamphetamine.

Afterward but in the same day, Cross discussed the situation with his supervisor and they decided to attempt to conduct a "knock and talk" with Defendant.   Some six or seven officers— all had been involved with executing the search warrant at the Informant's house—left the Informant's house and traveled to Defendant's residence in three cars for the purpose of conducting the knock and talk.

As the other officers waited in their vehicles at Defendant's house, Cross and his commander, Pat Doyle ("Doyle"), approached and knocked on the door of Defendant's residence.

2

A person later identified as Jonathan Smith ("Smith") answered the door. When Smith opened the door, he stepped outside and shut the door behind him. Cross thought this behavior was suspect even in January because, in his experience, people remain in their doorway with the door open in such circumstances. While the door was briefly open, however, Cross was able to smell a strong odor of raw marijuana. Smith told the officers he was housesitting and did not live at the residence. Smith also said that Defendant had gone to the doctor, but would return shortly. Smith was detained.

Cross testified that more than 90 percent of his work with the Task Force involves drug investigations. On the day at issue, he was familiar with the sight and smell of both raw and burnt marijuana. He is "100 percent" certain he smelled raw marijuana when Smith came out the door. Doyle told Cross he also detected the odor of raw marijuana.

Believing he had sufficient probable cause to obtain a search warrant for Defendant's residence, Cross decided to seek a search warrant. Before leaving to seek a search warrant, however, Cross decided to secure the residence by conducting a protective sweep. Cross described a protective sweep as checking for persons who could harm officers or destroy evidence. Cross decided to conduct a protective sweep because he did not know if weapons, or persons who might pose a danger or destroy evidence, were in the residence.

In Cross's law enforcement experience, people have, at times, hidden in a house and have also attempted to destroy evidence. He is also aware from general news reports of situations where people inside a house have attempted to harm law enforcement officers.

On direct examination, Cross indicated he "was told" that even if Defendant's vehicle was not present at the house, Defendant would likely be there. Cross never identified who told him this information or when he was told this. Regarding whether anyone other than Smith was in the

3

house that day on cross-examination, Cross admitted he saw no vehicles or any other indication that anyone else was in the house. Cross agreed that no lights were on in the small, two-bedroom house.

Cross, Doyle, and two other officers conducted the protective sweep. Cross looked in places a person could be hiding, including under the beds. Nobody was found in the house, but under one bed officers saw a "12 by 12" clear plastic tote container that appeared to contain a great deal of a crystal material. Founded on his law enforcement experience, Cross is familiar with ICE methamphetamine. Based on his observation of the crystal substance in the see-through container and the information he obtained from the Informant earlier that day about where the Informant got his ICE methamphetamine, Cross concluded the tote contained ICE methamphetamine. During the protective sweep, Cross did not remove the tote from under the bed, open it, or examine its contents; instead, it was left untouched under the bed. Cross also observed a money bill counter, which he found highly suspect.

After the protective sweep, all the officers vacated the house without conducting a further search. Cross left to prepare and application for a search warrant from a judge of the Magistrate Court of Catoosa County, Georgia. The other Task Force officers secured the residence until a warrant arrived.

At the location of the issuing judge, Cross prepared his Affidavit and Application for a Search Warrant [Exhibit 2; *see also* Doc. 285-1 (the "Affidavit")]. In the Affidavit, Cross notes he had been a police officer for five years and assigned to the drug Task Force for three years at the time. Cross's Affidavit states there is probable cause "to believe that there is now contained Marijuana and methamphetamine" at Defendant's residence because:

> On January 25, 2017 Agents received information that Scott Rounsaville was dealing a large amount of "ICE"

methamphetamine. Agents came to the residence to conduct a follow up investigation. Agents knocked on the front door of the residence and a white male later known as Johnathan Smith came to the door. Agents noticed a strong odor consistent with marijuana; Smith shut the door behind him as he stepped out onto the porch. Smith told Agents that Rounsaville was not there but that he would be back shortly. Smith also advised that he did not live at the residence, and that he lived in Chickamauga. Agents secured the residence for a search warrant. While securing the residence, Commander Doyle looked underneath the bed for persons still inside the residence and located a large clear plastic tote full of suspected "ICE" methamphetamine.

For the above reasons, Affiant has probable cause to believe that there is now contained Marijuana and methamphetamine, on the premises, vehicle, and/or persons described above.

[*Id*. at Page ID # 1339-40].

The search warrant was issued that same day around 4:00 p.m. [Doc. 285-1 at Page ID # 1341 (the "Warrant")].   Cross returned to Defendant's house with the Warrant and it was executed.   In addition to the container of ICE methamphetamine, the officers seized the money bill counter and two plastic containers of slightly less than a total of one pound of raw marijuana located in containers in the bookcase next to the front door.   Guns, paraphernalia and a large amount of cash were also found.   Various pictures of the seized evidence were made exhibits by both the Government and Defendant during the hearing.

During execution of the Warrant, Defendant arrived at the residence.   He was arrested and booked into the Catoosa County Jail on several drug trafficking charges.   Two days later, on January 27, 2017 and before Defendant had been brought before a judge on the state charges, Cross and two other officers engaged in a custodial interview of Defendant.   They asked Defendant if an attorney represented him.   When Defendant said no, the officers gave him *Miranda* warnings and asked if he wanted to give a statement.   Defendant does not dispute that he waived his *Miranda* rights and made incriminating statements about his involvement in drug trafficking.

5

Thereafter, Defendant was charged in federal court with conspiracy to distribute and possess with the intent to distribute 50 grams or more of methamphetamine (actual) in a multicount, multi-defendant Indictment and Superseding Indictment [Docs. 12, 253].

## II.   ANALYSIS

Defendant argues (1) the warrantless protective sweep was an illegal search, (2) the subsequently issued Warrant lacked probable cause, (3) his later confession was "fruit of the poisonous tree" as a result; and (4) the good faith exception does not apply.   The Government disagrees with each of Defendant's theories.

### A.  Warrantless Protective Sweep of Residence

Defendant's arguments are based on alleged violations of the Fourth Amendment, which provides "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures . . . ."   U.S. Const. amend. IV.[2]   Not every entry by police onto a suspect's property is a search.   There is an implied consent for the public, including police officers, to be able to approach an unobstructed residence and knock on the front door.   "The Sixth Circuit recognizes the use of knock and talk consensual encounters as a legitimate investigative technique at the home of a suspect or an individual with information about an investigation." *United States v. Chapman*, No. 1:08-CR-42, 2009 WL 301906, at *3 (E.D. Tenn. Feb. 6, 2009) (internal quotation marks omitted) (quoting *United States v. Thomas,* 430 F.3d 274, 277 (6th Cir. 2005)).

Defendant appears to question the intent/credibility of the law enforcement officers because they traveled to his house in a large group directly from the preceding search of the

---

[2] It is undisputed that Defendant had a legitimate expectation of privacy in the searched residence. *See United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) (holding "a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched.") (citing *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988))).

Informant's house.   Nevertheless, he does not dispute that the officers were lawfully able to attempt to engage in a voluntary discussion with an occupant of the residence via a "knock and talk" encounter.   *See Florida v. Jardines*, 569 U.S. 1, 8 (2013) (noting a police officer not armed with a warrant may approach a home and conduct a knock and talk).   Instead, Defendant contends the initial warrantless entry into, and search of, his residence, *i.e*., the protective sweep, that occurred immediately after the knock and talk encounter violated his Fourth Amendment right to be free from unreasonable searches.   The Government argues that the protective sweep was lawful to prevent the destruction of evidence.

Although a warrantless entry into a person's home is *per se* unreasonable under the Fourth Amendment, a warrantless entry to prevent the destruction of evidence is permissible if it is based on probable cause and supported by exigent circumstances.   *E.g.*, *Kentucky v. King*, 563 U.S. 452, 462 (2011) ("Where, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed."); *United States v. McClain,* 430 F.3d 299, 304 (6th Cir. 2005) (holding "the police may not enter a private residence without a warrant unless both 'probable cause plus exigent circumstances' exist.").   Courts have repeatedly recognized that law enforcement officers may conduct a home search without a warrant to prevent the imminent destruction of evidence.   *See, e.g.*, *Missouri v. McNeely*, 569 U.S. 141, 149 (2013); *Cupp v. Murphy*, 412 U.S. 291, 296 (1973).   *United States v. Ray*, 577 F. App'x 526, 531 (6th Cir. 2014); *United States. v. Haddix*, 239 F.3d 766, 768 (6th Cir. 2001); *United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir. 1984).   The government has the burden to demonstrate the existence of exigent circumstances sufficient to except law enforcement from complying with the warrant requirement.   *Id.* at 1162.

As held in *Morgan*, abandoning the warrant procedure is justified where *immediate* police action is necessary to prevent the destruction of vital evidence. 743 F.2d at 1163. The need to conduct such a protective sweep "may be particularly compelling where narcotics are involved, for narcotics can be easily and quickly destroyed while a search is progressing." *Sangineto-Miranda*, 859 F.2d at 1511. Still, courts recognize that "[n]otwithstanding the ease in which narcotics can be destroyed, a warrantless entry into the home of a suspected drug trafficker, effected without an objectively reasonable basis for concluding that the destruction of evidence is imminent, does not pass constitutional muster." *Haddix*, 239 F.3d at 768 (quoting *United States v. Radka*, 904 F.2d 357, 361 (6th Cir. 1990)). "The mere possibility or suspicion that a party is likely to dispose of evidence when faced with the execution of a search warrant is not sufficient to create an exigency." *United States v. Bates*, 84 F.3d 790, 796 (6th Cir. 1996) (citing *Radka*, 904 F.2d at 362; *United States v. Becker*, 23 F.3d 1537, 1541-42 (9th Cir. 1994)).

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *United States v. Evans*, 549 F. App'x 397, 402 (6th Cir. 2013) (alteration in original) (quoting *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006) (quoting other sources)). Thus, a warrantless entry into a defendant's house "does not trigger the exclusion of evidence if the officers had an 'objectively reasonable belief,' that the circumstances justified immediate entry." *Id.* (quoting *Johnson v. City of Memphis,* 617 F.3d 864, 868 (6th Cir. 2010)). The courts analyze whether such a belief was objectively reasonable under a totality of the circumstances standard. *See McNeely*, 569 U.S. at 145.

A two-pronged test has developed in the Sixth Circuit to prove a warrantless entry is justified to prevent the destruction of evidence. *Ray*, 577 F. App'x at 531. The test requires the Government to demonstrate by a preponderance of the evidence both "(1) a reasonable belief that

8

third parties are inside the dwelling; and (2) a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order." *Id.* (quoting *Sanguineto-Miranda*, 859 F.2d at 1512).

Few Sixth Circuit cases directly hinge on the first prong requirement of a reasonable belief that third parties are inside the dwelling. I find *Haddix* to be instructive.[3] In *Haddix,* the police saw marijuana plants surrounding the defendant's house and their knock on his door went unanswered. Although the defendant in *Haddix* was actually asleep in the house, the police did not know if the defendant was home when they entered without a warrant. The court held no exigent circumstances arose to support the warrantless entry and found that the mere fact that drugs were involved did not provide "an objectively reasonable basis" for believing that evidence would be destroyed. 239 F.3d at 767-68. This holding is consistent with the holding of *Sanguineto–Miranda*, that "[b]efore exigent circumstances are present . . . the police must have a reasonable basis for believing there is someone in the house who would likely destroy evidence." 859 F.2d at 1512; *see also United States v. Campbell*, 261 F.3d 628, 631 (6th Cir. 2001) (noting the police knew "to an absolute certainty" that the defendant was inside the house).

The Sixth Circuit's analysis in *United States v. Lewis*, 231 F.3d 238 (6th Cir. 2000), is also informative regarding the first prong of the test. In *Lewis*, an informant indicated there would be a drug transaction outside the house, which was corroborated by surveillance, but the informant gave no indication anyone would be in the house at the time of the transaction. *Id.* at 240-41. The police saw a person leave the house, but they did not see him or anyone else enter the house, they did not see anyone through a window of the house, and they did not hear anything inside the house. *Id.* The officers who entered the house were aware the defendant had been arrested, but

---

[3] The parties did not address many of the cases discussed herein.

they had no knowledge of the whereabouts of additional suspects and no reason to assume that anyone was inside the house. The court found the uncorroborated information that the two suspects were partners in a drug business operating out of the house did not support a reasonable belief that anyone was home at the time of the transaction. Finding the police had no reason to believe that third parties were inside the house, the court concluded that a belief that any evidence presumed to be inside the house was in danger of imminent destruction was unfounded. *Id*.

Also pertinent to the first prong analysis is *United States v. Johnson*, 457 F. App'x. 512 (6th Cir. 2012), in which the court addressed both prongs of the test. Regarding the first prong, the court credited the officer's belief that one or more persons remained inside the residence because the police observed a number of people entering and exiting the house, which led them to conclude that at least one individual remained in the house, and they observed lights and a television on in the house. 457 F. App'x. at 516-17. The court noted that, "[a]lthough the fact that a television and lights remained on are not conclusive evidence that someone is in the home, it gave the officers more than a 'mere suspicion' of occupancy, which is sufficient to form a basis of reasonable belief." *Id*.

Turning to the second prong, the *Johnson* court held exigent circumstances were present where the police were led to the residence after a report from a reliable, confidential informant indicated that a large-scale drug transaction would occur in the area; an individual believed to be a part of the drug transaction was seen traveling to two hotels to exchange a large bag with other targeted individuals, and directly after the transaction that individual went to the residence and left fifteen to twenty minutes later; when the individual was searched, officers found $66,000 and smelled a "very strong odor of raw marijuana" emanating from his car; the defendant was also seen leaving the residence and, once the defendant was searched, he had marijuana in his car; after

the defendant left the residence, the officers observed two other individuals arrive at the residence, stay for ten to twenty minutes and then leave, and one of those individuals had a lengthy criminal drug history. *Id*. Under the totality of these circumstances, the *Johnson* court held it was reasonable for the officers to believe marijuana would be located in the residence and the second prong of the test was met. *Id.* at 517-18.

Several other cases discuss circumstances meeting, or failing to meet, the two-pronged test with the holding focused on the second prong of the test. *Compare United States v. Straughter*, 950 F.2d 1223, 1230-31 (6th Cir. 1991) (holding exigent circumstances were present because police had a reasonable belief that evidence was likely to be destroyed when they knew that several suspects were inside a house, knew that several of their co-conspirators had recently been arrested, knew that the suspects communicated by cellular phone, and reasonably believed that the suspects in the house had a large supply of cocaine); *United States v. Ukomadu*, 236 F.3d 333, 337-38 (6th Cir. 2001) (holding exigent circumstances were present because police had a reasonable belief that evidence was likely to be destroyed when they knew suspects opened up a shipment of drugs from which the police had replaced most of the drugs with a beeper, and the visibly altered shipment would cause the suspects to realize police were involved); *with Radka*, 904 F.2d at 362 (holding no exigent circumstances arose to permit a warrantless search of a suspected drug house when police arrested a confederate of the house's occupants an eighth of a mile from the house, the intervening ground was heavily wooded, and there was no sign "that the enforcement activity outside the premises would have come to the attention of anyone who might be on the property.").

In the instant matter, Defendant argues the Government failed to meet both prongs of the two-pronged test because it did not prove articulable facts that support a reasonable belief that Defendant's house harbored any person who posed a danger or could destroy evidence. The

Case 1:17-cr-00069-TRM-SKL   Document 328   Filed 07/27/18   Page 11 of 27
PageID #: 1703

Government argues the officers had a reasonable belief that there were others inside Defendant's residence who would attempt to destroy drug evidence while a warrant was being obtained. The Government argues the following alleged factors meet the two-pronged test: (1) Smith did not live at the residence and claimed Defendant was not home, but it was reasonable to believe that Smith would not be left in the home alone; (2) Smith quickly closed the front door behind him suggesting he was attempting to shield someone or something from being viewed by the officers; (3) the smell of marijuana was strong enough to be detected outside the house, so the police knew their presence would be an incentive to a person remaining in the house to destroy, at least, marijuana evidence; and (4) Cross had past experience in drug investigations with persons hiding in a home and/or attempting to destroy evidence.

The parties were given an opportunity to address the pertinent issues in post-hearing briefs. In its post-hearing brief, the Government cites to *Ray* and *Sangineto–Miranda* to support its position. However, in *Ray*, the court did not reach the issue of whether either prong of the two-pronged test was met when the police entered the suspect's hotel rooms without a warrant. Instead, the court in *Ray* concluded that the information obtained in the initial warrantless sweep was not necessary to secure the warrant and that all evidence discovered during the sweep would have been discovered during the later search pursuant to the warrant. *Ray*, 577 F. App'x at 531.

*Sangineto–Miranda* is equally unavailing as support for the Government's argument that the first prong is met. It was undisputed that the first prong was met and that persons were known to be inside the residence in *Sangineto–Miranda*. The *Sangineto–Miranda* court addressed only the second prong of the test. In so doing, the court held that exigent circumstances were present because the police, who had strong reason to think a suspect had drugs in the residence, had arrested the suspect's colleague after he left the residence on a brief errand during the negotiation

of a drug deal. *Sangineto–Miranda*, 859 F.2d at 1512-13. As law enforcement agents had questioned the suspect earlier that day, the court concluded the police could reasonably believe the continued absence of the suspect's colleague would alert the suspect that police were on their trail prompting the suspect to destroy the narcotics before the police could obtain a warrant. *Id.* at 1513.

In spite of the Government's arguments about what would have been reasonable to believe, Cross offered little testimony about the alleged factors or what might have led to an objectively reasonable belief that any persons were inside the house. On direct examination, Cross merely testified that after Smith said Defendant was not home, the officers "decided to go ahead and do a protective sweep of the residence not knowing for sure if anybody was in the residence or not, not knowing if there was any weapons in the residence or not." [Doc. 314 at Page ID # 1498]. When asked on cross-examination to confirm that he saw no indication that anyone was in the house, no lights on in the house, and no vehicles present, Cross testified that he saw no indications of anyone in the house, no lights on, and no other vehicles [*id.* at Page ID # 1515]. Considering the relevant testimony, Cross and Doyle smelled the strong odor of raw marijuana coming from the house when Smith exited and quickly shut the door behind him, which Cross found suspicious. The officers knew the Informant admitted to engaging in a large methamphetamine deal in the home with Defendant. They knew Smith confirmed that Defendant lived at the house as claimed by the Informant and that Smith said Defendant was not at home.

The officers should have known the "mere possibility" of destruction of drug evidence is not a sufficient basis for a warrantless entry. *Radka,* 904 F.2d at 362. The factors cited by the Government simply do not establish an objectively reasonable basis for believing there was someone in the house. First, that Smith did not live at the residence adds little to the analysis.

No testimony or case law was presented to support the reasoning that it was unlikely Smith would be left at the home alone.

Second, that Smith quickly shut the door in what might have been an attempt to hide someone or something from Cross's view (or sense of smell) is pertinent, but adds little because hiding "something" was just as likely as hiding "someone."

Third, the Government did not attempt to show how the strong odor of raw marijuana as Smith exited the residence applied to the first prong of the test. Instead, the Government contends the odor meant the police knew their presence would be an incentive to a person remaining in the house to destroy any marijuana evidence. While the strong odor of raw marijuana reasonably indicates a fair probability contraband or evidence of an illegal drug—marijuana—will be found in the house, the odor does not indicate a person is in the house.

Finally, that Cross had some undefined past experience in some unrelated drug investigations with persons hiding in a home adds little to the required case-specific analysis. While it was far from clear, Cross's sparse testimony about his experience likely means that more often than not, persons are not hiding in a house. Again, no testimony was presented to support how Cross's ill-defined experience with one or more persons hiding in some prior search scenario—that may or may not have been similar to the circumstances at issue—might lend itself to an objectively reasonable belief that persons were present in Defendant's residence. *See United States v. Ramirez*, 676 F.3d 755, 760-63 (8th Cir. 2012) (holding exigent circumstances did not justify warrantless entry into a hotel room when an occupant partially opened the door, the officer's announced themselves, and the occupant tried to shut the door).

In contrast to the Government's list of dubious factors, Cross admitted he saw no indication that anyone else was in the small, two-bedroom house. Cross admitted he saw no lights on in the

14

house or any non-police vehicles present. Cross did not testify about any noise coming from the house. Likewise, Cross offered no testimony about information from the Informant or his earlier drive-by with the Informant that might indicate another person was present at the house.

Applying a totality of the circumstances standard, I **FIND** the Government has failed to meet the first prong of the test, as it has not demonstrated a reasonable belief that any person was inside the dwelling after Smith came out. At best, the Government has proven the police did not know whether Defendant (or any other person) was home when they entered without a warrant.

As the Government has not met its burden to prove an objectively reasonable basis to believe there was someone in the house, it is not necessary to further address the second prong. Based on the evidence submitted at the hearing, I **CONCLUDE** that no exigent circumstances arose to justify the warrantless entry and sweep search. *See Haddix,* 239 F.3d at 767-68; *Evans*, 549 F. App'x. at 407. As a result, I **FIND** the observations made during this unlawful protective sweep must be excluded when considering whether there was probable cause for the issuance of the Warrant.

### B. The Warrant

The Fourth Amendment sets a minimal evidentiary standard under which a magistrate may issue a warrant by commanding that "no warrant shall issue but upon probable cause." U.S. Const. amend. IV. Thus, in order to be valid under the Fourth Amendment, a search warrant must be supported by probable cause. *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008). "Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence will be found in a particular place." *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001) (internal quotation marks omitted) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)); *accord Bailey v. City of Ann Arbor*, 860

15

Case 1:17-cr-00069-TRM-SKL    Document 328    Filed 07/27/18    Page 15 of 27
PageID #: 1707

F.3d 382, 387 (6th Cir. 2017).

When determining whether a warrant is supported by probable cause, a court's review is limited to the four corners of the supporting affidavit. *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006). The sufficiency of a warrant affidavit that contains information from an unlawful search is evaluated after excising the offending information and evaluating whether what remains is sufficient to establish probable cause. *See Johnson*, 457 F. App'x at 517.

The Court must, therefore, determine whether, when the information about the ICE methamphetamine observed under the bed is excluded from Cross's Affidavit as a violation of the Fourth Amendment, the Warrant is still supported by probable cause. The Government argues that even if the protective sweep was unlawful and the observations gained during that sweep are removed from Cross's Affidavit, there remains sufficient probable cause supporting the Warrant.[4] In making this argument, the Government relies primarily on the Affidavit's inclusion of Cross's detection of the odor of marijuana and, to a far lesser extent, the tip that Defendant was dealing a

---

[4] Evidence observed while lawfully securing the premises is admissible and properly included in a warrant application. *See Arizona v. Hicks*, 480 U.S. 321, 324–25 (1987) (stating that visual inspection of items which come into an officer's view while he is validly searching a house's interior for a suspect pursuant to exigent circumstances does not constitute an illegal search). The clear plastic container of suspected methamphetamine was found under a bed—an obvious place to look for someone hiding despite Defendant's protests to the contrary. If the discovery of the suspected ICE methamphetamine was constitutional, then that discovery most certainly may properly be included in the probable cause determination. *See, e.g.*, *United States v. Davis*, 341 F. App'x 139, 142 n. 3 (6th Cir. 2009) (stating that the discovery of a gun would have been constitutional had it been in plain view during the course of a lawful protective sweep); *United States v. Lanier*, 285 F. App'x 239, 241 (6th Cir. 2008) ("While conducting a protective sweep, an officer may seize contraband found in plain view if its incriminating character is immediately apparent."). Defendant does not seriously contest that Cross's Affidavit provides probable cause *if* the protective sweep is upheld and the resulting observation of suspected ICE methamphetamine is included in the probable cause determination. For the sake of clarity, if the Court determines the protective sweep was lawful (contrary to my recommendation), I **FIND** the Affidavit, as drafted, contains ample probable cause supporting the Warrant.

Case 1:17-cr-00069-TRM-SKL   Document 328   Filed 07/27/18   Page 16 of 27
PageID #: 1708

large amount of ICE methamphetamine.

The four corners of the Affidavit do not identify Cross as one of the "Agents" who detected the odor of marijuana. The Affidavit does not address the olfactory acuity, experience, or qualifications of the unnamed "Agents" to detect such an odor of marijuana. While the Affidavit's failure to address the ability to recognize the odor of marijuana appears to be Defendant's main argument, Defendant's post-hearing brief also appears to question whether Cross actually detected the odor of marijuana as Smith exited the residence. Defendant, however, did not make any request for, and is not entitled to, a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

Moreover, to the extent Defendant is now attempting to contest the truthfulness of the Affidavit, I **FIND** Cross credibly testified that he smelled a strong odor of raw marijuana from the house and that Doyle reported to Cross he did as well. Evidence about the type of container the marijuana was maintained in when the officers executed the Warrant was far from sufficient to call into question Cross's credible testimony in this regard. Thus, in reviewing the four corners of the Affidavit in the required commonsense manner, I have concluded that law enforcement officers noticed a strong odor of marijuana as Smith exited the residence as stated in the Affidavit.

The testimony is clear that the officers smelled *raw* marijuana, but the Affidavit in this case does not specify if the detected odor was of burnt or raw marijuana. Defendant suggests that an odor of burnt marijuana means the drug itself may no longer be present, as Smith might have ingested it. However, even when the odor is of burnt marijuana, cases suggest that detection of the odor of burnt drugs is sufficient to support a finding of probable cause for the issuance of a search warrant. *See, e.g.*, *Johnson v. United States*, 333 U.S. 10, 13 (1948) (recognizing that the odor of a burning controlled substance "might very well be found to be evidence of most persuasive

17

character" in finding probable cause to issue a search warrant); *United States v. Cephas*, 254 F.3d 488, 495 (4th Cir. 2001) (suggesting that the odor of burning marijuana emanating from inside an apartment alone would almost certainly have given an officer probable cause to believe contraband—marijuana—was present in an apartment); *but see United States v. Morgan*, 160 F. App'x 694, 698 (10th Cir. 2005) (declining to decide whether the smell of burned marijuana coming from a residence, standing alone, would establish sufficient probable cause for a search warrant, but stating that the smell together with a defendant's admission provided probable cause for a search warrant).

Whether an officer's detection of the odor of raw marijuana as an occupant exits the home during a knock and talk is enough probable cause for a search warrant for the home is the pertinent issue in this case.   An officer's detection of the odor of marijuana coming from a vehicle, standing alone, provides probable cause for a warrantless search of the vehicle.   *See, e.g.*, *United States v. Koger*, 152 F. App'x 429, 430-31 (6th Cir. 2005) (affirming a finding of probable cause based on the smell of marijuana from car); *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004) (affirming a finding of probable cause based on the smell of marijuana from car).   This same reasoning has been applied to the odor of marijuana within or emanating from a home smelled by officers experienced at recognizing the odor when coupled with an anonymous tip; a tip the smell of marijuana corroborated.   *United States v. Elkins*, 300 F.3d 638, 658-60 (6th Cir. 2002).

Unlike in this case, however, in *Elkins* the affidavit set out that the officer's experience permitted the officer to accurately identify the smell of marijuana and that an anonymous tip was received that the homeowners were growing marijuana in their home.   Defendant's main argument that the officers' detection of the odor of marijuana is insufficient to establish probable cause is focused on the fact that the Affidavit contains no indication of the ability of Cross to detect

18

that odor.   The Government notes the Affidavit recites Cross's five years of police experience with three years on the drug Task Force.   However, as noted above, Cross is never identified in the four corners of the Affidavit as being one of the unidentified "Agents."

In *United States v. Talley*, 692 F. App'x 219 (6th Cir. 2017), the defendant made similar arguments that the court could not credit the detectives' observation of an "obvious and distinct" marijuana odor because the affidavit included no information about their expertise in identifying the drug by its smell.   Addressing this argument, the Sixth Circuit held:

> Talley cites *United States v. Elkins*, in which we explained that the strong odor of marijuana inside a home—when "coupled with the uncontested statement that the officers were experienced at recognizing the smell"—went "a considerable way toward establishing" the validity of a warrant to search that home. 300 F.3d 638, 659 (6th Cir. 2002). Nothing in *Elkins*, however, requires an officer to attest that he has specialized training in detecting marijuana's odor before we may give any weight to his claims of having smelled it. Nor does Talley point to case law articulating such a rule. Although more information about Detectives Bevis's and Bowers's investigatory experience and olfactory acuity would have bolstered their reports, the lack of such information does not defeat probable cause, especially given that the marijuana odor *plus* the trash-pull evidence and Talley's criminal history justified the search.

*Id*. at 222 (6th Cir. 2017).[5]   Under the reasoning of *Talley*, while Cross did not include a statement about the unnamed Agents' "investigatory experience and olfactory acuity" in his Affidavit, that lack of information is just one factor to consider and it certainly does not defeat probable cause.

Reviewing the four corners of the affidavit—without the excluded information gained in the protective sweep—the affidavit describes that Agents received information that Defendant was dealing in ICE methamphetamine, which explains why the police were at Defendant's house to

---

[5]Defendant's request that the Court consider Georgia state law [Doc. 285 at Page ID # 1330-31], is unavailing to the extent it differs from applicable and binding precedent.

talk to him.   As Smith came to the door, "Agents noticed a strong odor consistent with marijuana; Smith shut the door behind him as he stepped out onto the porch."   Smith said Defendant was not there but that he would be back shortly and Smith advised that he (Smith) did not live at the residence.   Although the Affidavit does not clearly state that the odor is emanating from the residence, it is a reasonable inference to make from the four corners of the Affidavit.

Addressing the tip first, the Government contends it can be considered as part of the totality of the circumstances, but also concedes the Affidavit provides no information to show either reliability of the unidentified tipster or corroboration of the tip.   *See United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (**holding that** "in the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration."). The tip disclosed in the Affidavit suggests only that unidentified Agents received information that day that Defendant was dealing a large amount of ICE methamphetamine—not marijuana.   This information must be considered as if an anonymous tip—without any proven reliability or corroboration—based upon the information contained within the four corners of the Affidavit. The Affidavit does not reflect that the tip was an admission of criminal activity by the Informant or that the Informant indicated Defendant was dealing methamphetamine from his residence.

Given that the Affidavit's recitation of "information" about Defendant being a methamphetamine dealer has no nexus to Defendant's residence or to marijuana, I **FIND** it does not save the Affidavit if the odor alone in not enough for probable cause.   A finding of probable cause must rise or fall on the Agents' detection of an odor of marijuana as Smith walked out and shut the door behind him.   The language of *Talley* and at least one other unpublished case from the Sixth Circuit, *United States v. Yarbrough*, 272 F. App'x 438 (6th Cir. 2007) (per curiam), may indicate, but do not specifically find, odor alone is enough to establish probable cause for a search

20

warrant.  *Talley* has been discussed above.   In *Yarbrough*, the Sixth Circuit held "an officer's detection of the smell of marijuana in a home may by itself establish probable cause." 272 F. App'x at 443.   Similar to *Talley*, in *Yarbrough* there was more than just the detection of a marijuana odor outside the residence to support probable cause.   The smell of marijuana was coupled with an anonymous tip that Yarbrough had three pounds of marijuana, the officers detected the presence of marijuana in a vehicle outside the residence, and the tip's report of the first and last name of the occupants of the residence, their address, and that a white Land Rover with South Carolina plates was at the residence was verified.

Applying *Talley*, the district court in *Porter* very recently noted the Sixth Circuit has never specifically decided whether a smell of marijuana emitting from a home is, in and of itself, sufficient to provide probable cause for the search of a residence.   *United States v. Porter*, No. 1:17-CR-00015, 2018 WL 2463103, at *4 (M.D. Tenn. June 1, 2018).   The *Porter* court further noted that the case law of this circuit "strongly suggests that the smell of marijuana identifiably emanating from a home may, in appropriate situations, be sufficient to support probable cause." *Id.* at *5.

This case presents a close question.   The uncorroborated, anonymous tip that a resident of the house is a dealer of a significant amount of a different illegal drug adds very little to the analysis.   Under the case law addressed above, however, it appears the detection of the odor of marijuana is enough to establish probable cause in the Sixth Circuit even though the Affidavit failed to address the "Agents" olfactory qualifications or experience with the detection of marijuana by its odor.   Accordingly, I **FIND** the affidavit to be adequate to establish probable

cause for the issuance of the Warrant to search the residence for illegal drugs.[6]

## C. Good Faith Exception

As the Court may conclude otherwise given the dearth of binding precedent where odor stands nearly alone as the supporting probable cause, I will also address whether the good faith exception applies under the circumstances. "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc) (quoting *Illinois v. Krull*, 480 U.S. 340, 347 (1987)). *See also Herring v. United States*, 555 U.S. 135, 143 (2009); *United States v. Buford*, 632 F.3d 264, 270 (6th Cir. 2011). However, "the decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred." *United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010).

There is "an exception to the exclusionary rule where 'the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid.'" *United States v. Watson*, 498 F.3d 429, 431 (6th Cir. 2007) (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 987-88 (1984)); *see also United States v. Leon*, 468 U.S. 897, 922-23 (1984). As relevant here, however, the good-faith exception will not apply where "the affidavit is 'so lacking in [indicia of] probable cause as to render official belief in its existence entirely unreasonable'" or "where the officer's reliance on the warrant was

---

[6] Defendant makes an undeveloped argument in his original brief that is not addressed in his post-hearing brief, apparently questioning the particularity of the Warrant. This argument, to the extent not abandoned, is unavailing and rejected as the Warrant meets the particularity requirement. *See Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Moreover, evidence not described in a search warrant may be seized if it is reasonably related to the offense that formed the basis for the search warrant. *See United States v. Korman*, 614 F.2d 541, 547 (6th Cir. 1980).

neither in good faith nor objectively reasonable." *Frazier*, 423 F.3d at 533 (quoting *Leon*, 468 U.S. at 923).

Cutting to the chase, I **FIND** the Affidavit is not so lacking in indicia of probable cause as to render the officers' belief in probable cause entirely unreasonable and that the officers' reliance on the Warrant was objectively reasonable. *See Leon*, 468 U.S. at 918. Like the court in *Porter*, I conclude that the officers did have probable cause for Warrant, but that even if the information supporting probable cause were to fall short, the fruits of the search would be admissible because the evidence was discovered during the good-faith execution of the seemingly valid Warrant. *See Porter*, 2018 WL 2463103, at *5.

However, there is a complicating issue to consider in reaching this result. There is conflicting authority, even within the Sixth Circuit, concerning whether the good faith exception can ever be applied when officers act pursuant to a search warrant obtained through information gained during an illegal predicate search. The Sixth Circuit has framed the issue as how to "reconcile the 'good faith' exception established in *Leon* . . . with the 'fruit of the poisonous tree' doctrine[.]" *United States v. McClain*, 444 F.3d 556, 564 (6th Cir. 2005). In *McClain*, police conducted an illegal protective sweep of a residence, unduly believing that a possible burglary was in progress. A different officer subsequently sought a search warrant for the house, suspecting a marijuana growing enterprise based on information obtained during the illegal sweep. *Id*. at 560.

The Sixth Circuit in *McClain* affirmed that the initial entry and search were illegal, and turned to the question of whether that taint should render the reliance on the magistrate's issuance of the warrant as being beyond the scope of the good-faith exception. *Id*. at 564. The court concluded that "this is one of the unique cases in which the *Leon* good-faith exception should apply despite an earlier Fourth Amendment violation." *Id*. at 565. The Sixth Circuit found that

23

"the facts surrounding the initial Fourth Amendment violation were 'close enough to the line of validity to make the officer's belief in the validity of the warrant objectively reasonable." *Id*. at 566 (quoting *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989)).

Other facts also contributed to the court's conclusion in *McClain*. First, there was no indication that the officers were consciously violating the Fourth Amendment when they conducted the illegal sweep of the house. *Id*. "More importantly, the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search, and [the] warrant affidavit fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search." *Id*. All of these circumstances convinced the Sixth Circuit the *Leon* exception applied in *McClain*.

As acknowledged by Defendant, the holding in *McClain* appears to be at odds with *dicta* in a footnote in *United States v. Davis*, 430 F.3d 345 (6th Cir. 2005), an earlier case where the Sixth Circuit stated, "we agree with the numerous other circuits that have held that the *Leon* good-faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure." *Id*. at 358, n.4. The *McClain* opinion came after *Davis*, but does not mention it. This Court is bound by *McClain* and not the *dicta* in *Davis*. *United States v. Fugate*, 499 F. App'x 514, 519 (6th Cir. 2012). Thus, Defendant's suggestion—that the good faith exception must be "per se rejected" because of the Fourth Amendment violation under *Davis* [Doc. 285 at Page ID # 1331]—fails based on *Fugate*. *Id*.

Defendant also argues the good faith exception should be rejected under the particular facts of this case. Defendant contends the exception under *McClain* does not apply because there was not a "close call" on the existence of exigent circumstances and the same officers who conducted the warrantless entry obtained and executed the Warrant. If *McClain* was the last word,

Defendant's arguments might prevail based on the involvement of Cross in both the Fourth Amendment violation and the Warrant's execution. Two Supreme Court cases decided after *McClain*, however, reinforce that suppression is not appropriate here.

In *Herring v. United States*, 555 U.S. 135, 137 (2009), the Supreme Court held "suppression is not an automatic consequence of a Fourth Amendment violation." Instead, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price" of "letting guilty and possibly dangerous defendants go free." *Id.* at 141, 144 (evidence should not be suppressed where officer who stopped a suspect did not act deliberately, recklessly, or grossly negligently).

Similarly, in *Davis v. United States*, 564 U.S. 229 (2011), the Supreme Court reiterated that the "deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." *Id.* at 228 (quoting *Herring*, 555 U.S. at 143) (declining to apply exclusionary rule to evidence seized pursuant to search conducted in compliance with binding precedent that was later overturned). *See also Master*, 614 F.3d at 243 (discussing the balancing test whereby a court can suppress evidence following a Fourth Amendment violation if the benefits of deterrence outweigh the costs). *Herring* and *Davis* underscore that police culpability is an indispensable prerequisite to suppression.

There is simply no such culpability here. *See Porter*, 2018 WL 2463103, at *5. Although Cross was involved in both the initial, unconstitutional protective sweep and the execution of the search warrant, he had an objectively reasonable, good-faith belief in the validity of the search warrant based on his detection of the odor of marijuana. Cross's supporting Affidavit in this case is not so deficient that a reasonable officer would not be justified in relying

25

on the validity of the search warrant. Moreover, as in *McClain*, the Affidavit in this case disclosed "the circumstances surrounding the initial warrantless search." 444 F.3d at 566.

The Sixth Circuit has said that the "crucial finding" to support suppression is that the "'police [mis]conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *Master*, 614 F.3d at 243 (quoting *Herring*, 555 U.S. at 144). A relevant question is whether the police conduct involved a deliberate, reckless, or grossly negligent violation of Defendant's constitutional rights. In this case, no evidence of sufficiently flagrant conduct exists to warrant suppression. The cost of excluding the evidence in this case would be great and the deterrent effect would not be worth the price paid by the justice system.

Even if the Affidavit without the excised information does not contain probable cause for issuance of the Warrant, the results of the search should not be suppressed because I **FIND** the officers acted in good faith reliance on the Warrant. Accordingly, I **CONCLUDE** Defendant's motion to suppress evidence seized from his residence should be **DENIED**.

### D. Statement

If the Court accepts my recommendations, it is not necessary to address Defendant's argument that his statement should be suppressed as fruit of the poisonous tree; either the search warrant was supported by probable cause or the good faith exception applies.

26

## III. CONCLUSION

For the reasons stated above, I **RECOMMEND**[7] that Defendant's motion to suppress [Docs. 283] be **DENIED**.

s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[7] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).