UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | Case No. 1:17-cr-69-4 |
| v. | ) | |
| | ) | Judge Mattice |
| | ) | Magistrate Judge Lee |
| RANDALL SCOTT ROUNSAVILLE. | ) | |

## ORDER

This matter is before the Court upon Defendant's Objections [Doc. 337] to Magistrate Judge Susan K. Lee's Report and Recommendation ("R&R") [Doc. 328]. In her R&R, Magistrate Judge Lee recommended Defendant's Motion to Suppress [Doc. 283] be denied. Defendant challenges the R&R's legal conclusions and Magistrate Judge Lee's credibility determinations. [*See* Doc. 337]. The Government has responded to his arguments. [Doc. 340]. Upon review and for the reasons that will be discussed herein, Defendant's objections will be **OVERRULED**. [Doc. 337]. Because the Court **ACCEPTS and ADOPTS** Magistrate Judge Lee's R&R [Doc. 328], Defendant's Motion to Suppress [Doc. 283] will be **DENIED**.

I.  **BACKGROUND**

Other than Defendant's objections to Officer Greg Cross's credibility, the Parties do not otherwise object to the Magistrate Judge's factual findings, and the Court concludes that they are accurate. Magistrate Judge Lee's findings, as summarized by her, are as follows:

> The government called Officer Greg Cross ("Cross"), a six-year veteran of the Fort Oglethorpe Police Department assigned for almost five years to the Lookout Mountain (Ga.) Judicial Circuit Drug Task Force, which is a drug task force comprised of multiple city and county police and

sheriff's departments ("Task Force"). Cross was the sole witness presented during the evidentiary hearing. Pertinent facts are summarized below.

On January 25, 2017, Cross and other officers of the Task Force served an unrelated search warrant as part of an investigation into the distribution of methamphetamine in Georgia. During the execution of this unrelated search warrant, "ICE" methamphetamine was found. The man found with the ICE methamphetamine ("the Informant") provided information to Cross. The Informant told Cross that he had purchased the ICE methamphetamine found in his home from Defendant at Defendant's house. The Informant traveled with Cross to physically show Cross where Defendant lived that same day. Cross had no information about the veracity or reliability of the Informant. Instead, Cross knew the Informant was arrested with methamphetamine and identified Defendant as his source and Defendant's house as the location where he obtained the methamphetamine.

Afterward but in the same day, Cross discussed the situation with his supervisor and they decided to attempt to conduct a "knock and talk" with Defendant. Some six or seven officers— all had been involved with executing the search warrant at the Informant's house—left the Informant's house and traveled to Defendant's residence in three cars for the purpose of conducting the knock and talk.

As the other officers waited in their vehicles at Defendant's house, Cross and his commander, Pat Doyle ("Doyle"), approached and knocked on the door of Defendant's residence. A person later identified as Jonathan Smith ("Smith") answered the door. When Smith opened the door, he stepped outside and shut the door behind him. Cross thought this behavior was suspect even in January because, in his experience, people remain in their doorway with the door open in such circumstances. While the door was briefly open, however, Cross was able to smell a strong odor of raw marijuana. Smith told the officers he was housesitting and did not live at the residence. Smith also said that Defendant had gone to the doctor, but would return shortly. Smith was detained.

Cross testified that more than 90 percent of his work with the Task Force involves drug investigations. On the day at issue, he was familiar with the sight and smell of both raw and burnt marijuana. He is "100 percent" certain he smelled raw marijuana when Smith came out the door. Doyle told Cross he also detected the odor of raw marijuana.

Believing he had sufficient probable cause to obtain a search warrant for Defendant's residence, Cross decided to seek a search warrant. Before leaving to seek a search warrant, however, Cross decided to secure the residence by conducting a protective sweep. Cross described a protective sweep as checking for persons who could harm officers or destroy evidence. Cross decided to conduct a protective sweep because he did not know if weapons, or persons who might pose a danger or destroy evidence, were in the residence.

In Cross's law enforcement experience, people have, at times, hidden in a house and have also attempted to destroy evidence. He is also aware from general news reports of situations where people inside a house have attempted to harm law enforcement officers. On direct examination, Cross indicated he "was told" that even if Defendant's vehicle was not present at the house, Defendant would likely be there. Cross never identified who told him this information or when he was told this. Regarding whether anyone other than Smith was in the house that day on cross-examination, Cross admitted he saw no vehicles or any other indication that anyone else was in the house. Cross agreed that no lights were on in the small, two-bedroom house.

Cross, Doyle, and two other officers conducted the protective sweep. Cross looked in places a person could be hiding, including under the beds. Nobody was found in the house, but under one bed officers saw a "12 by 12" clear plastic tote container that appeared to contain a great deal of a crystal material. Founded on his law enforcement experience, Cross is familiar with ICE methamphetamine. Based on his observation of the crystal substance in the see-through container and the information he obtained from the Informant earlier that day about where the Informant got his ICE methamphetamine, Cross concluded the tote contained ICE methamphetamine. During the protective sweep, Cross did not remove the tote from under the bed, open it, or examine its contents; instead, it was left untouched under the bed. Cross also observed a money bill counter, which he found highly suspect.

After the protective sweep, all the officers vacated the house without conducting a further search. Cross left to prepare and application for a search warrant from a judge of the Magistrate Court of Catoosa County, Georgia. The other Task Force officers secured the residence until a warrant arrived.

At the location of the issuing judge, Cross prepared his Affidavit and Application for a Search Warrant [Exhibit 2; see also Doc. 285-1 (the "Affidavit")]. In the Affidavit, Cross notes he had been a police officer for five years and assigned to the drug Task Force for three years at the time. Cross's Affidavit states there is probable cause "to believe that there is now contained Marijuana and methamphetamine" at Defendant's residence because:

> On January 25, 2017 Agents received information that Scott Rounsaville was dealing a large amount of "ICE" methamphetamine. Agents came to the residence to conduct a follow up investigation. Agents knocked on the front door of the residence and a white male later known as Johnathan Smith came to the door. Agents noticed a strong odor consistent with marijuana; Smith shut the door behind him as he stepped out onto the porch. Smith told Agents that Rounsaville was not there but that he would be back shortly.

3

> Smith also advised that he did not live at the residence, and that he lived in Chickamauga. Agents secured the residence for a search warrant. While securing the residence, Commander Doyle looked underneath the bed for persons still inside the residence and located a large clear plastic tote full of suspected "ICE" methamphetamine. For the above reasons, Affiant has probable cause to believe that there is now contained Marijuana and methamphetamine, on the premises, vehicle, and/or persons described above.
>
> [Id. at Page ID # 1339-40].
>
> The search warrant was issued that same day around 4:00 p.m. [Doc. 285-1 at Page ID # 1341 (the "Warrant")]. Cross returned to Defendant's house with the Warrant and it was executed. In addition to the container of ICE methamphetamine, the officers seized the money bill counter and two plastic containers of slightly less than a total of one pound of raw marijuana located in containers in the bookcase next to the front door. Guns, paraphernalia and a large amount of cash were also found. Various pictures of the seized evidence were made exhibits by both the Government and Defendant during the hearing.
>
> During execution of the Warrant, Defendant arrived at the residence. He was arrested and booked into the Catoosa County Jail on several drug trafficking charges. Two days later, on January 27, 2017 and before Defendant had been brought before a judge on the state charges, Cross and two other officers engaged in a custodial interview of Defendant. They asked Defendant if an attorney represented him. When Defendant said no, the officers gave him Miranda warnings and asked if he wanted to give a statement. Defendant does not dispute that he waived his Miranda rights and made incriminating statements about his involvement in drug trafficking. Thereafter, Defendant was charged in federal court with conspiracy to distribute and possess with the intent to distribute 50 grams or more of methamphetamine (actual) in a multicount, multidefendant Indictment and Superseding Indictment [Docs. 12, 253].

[Doc. 328 at 2–6].

In her R&R, Magistrate Judge Lee found the initial sweep of Defendant's home was a constitutional violation, but she also went on to find that when the evidence obtained from the sweep was excised from the warrant affidavit, the subsequent search warrant was supported by probable cause. She further determined that even if the warrant was defective, the officers reasonably relied on it, and the good faith exception to the exclusionary likewise permitted the admissibility of the evidence obtained from

the warranted search. As a result, she recommended Defendant's Motion to Suppress be denied.

## II. ANALYSIS

The Court starts with the event at the core of the issues presented, which is the warrantless entry into Defendant's home. When police enter a home without a warrant or consent, it raises a red flag. Warrantless government intrusion into the home is the "chief evil" the Fourth Amendment guards against. *Payton v. New York*, 445 U.S. 573, 585 (1980). Such searches are "*per se* unreasonable." *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). Few constitutional lines are brighter. *See, e.g.*, *id.* In her well-reasoned opinion, Magistrate Judge Lee concluded that the initial warrantless search of Defendant's home was an unconstitutional intrusion due to there being no reasonable exigency to support the entry. Defendant does not oppose that finding, and the Government has not raised an objection. [*See* Doc. 340]. This tacit concession is telling. Cross and the Task Force's warrantless entry into Defendant's home was a lamentable violation of his constitutional rights. In any event, it is the Court's task to consider how this case should move forward given that conclusion. Defendant seeks to suppress evidence related to the unlawful search under the exclusionary rule.

The exclusionary rule is a powerful remedy. That rule requires, in sum, that evidence obtained as a result of an unconstitutional search be suppressed at trial. *See Weeks v. United States*, 232 U.S. 383 (1914). More often than not, if an unlawful search happens early in the criminal investigation leading up to the defendant's indictment, it may require the suppression of the government's entire evidence, resulting in case dismissal. It goes without saying that this can be a disproportionate remedy, especially when the violation is a technicality and the criminal is a danger to society. Further, not

only should the exclusionary rule's potency make one wary, its pedigree is also questionable. It is after all a "judicial innovation," devised in its modern form in the 20th Century, well after the founding. *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011). It is expressly ordained neither by constitutional text nor the will of democratic majorities. Given this, prudence mandates careful administration. *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (holding exclusion is a "last resort, not a first impulse").

When a constitutional violation taints a criminal proceeding, courts should first, to the extent possible, prevent the government from profiting from the taint. If the government obtained its evidence solely through unconstitutional means, suppressing the evidence may very well be the only way of doing so. On the other hand, if evidence can be said to have two potentially independent sources, one being constitutional and the other not, suppression is not warranted. *Murray v. United States*, 487 U.S. 533 (1988). This is such a case.

### A. *Murray*

The facts presented here are not uncommon. Courts have frequently faced similar situations, where police conduct a warrantless search, then go to a magistrate to obtain a warrant, and return to the premises to search again and seize what had previously been found. The governing law in these circumstances is *Murray* and its progeny. 487 U.S. at 537. Under *Murray*, "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality" is admissible. *Id.* The rationale is that evidence obtained in the later lawful search, which rediscovered what first had been found unlawfully, is admissible under

what is said to be an "independent source," if that source is untainted by the unlawful search. *Id.*

The *Murray* rule is seemingly straightforward, but its application can become murkier when determining whether the initial unlawful search tainted the later, lawful search. First, for *Murray*'s exception to the exclusionary rule to apply, the initial unlawful search must not have been what prompted the police to seek a search warrant for the subsequent lawful search. 487 U.S. at 542; s*ee also United States v. Williams*, 656 F. App'x 751, 753 (6th Cir. 2016).

Here, Magistrate Judge Lee found Cross and the Task Force had already decided to obtain a search warrant before doing their unlawful initial "sweep," which they did merely to check for persons "who could harm officers," presumably during the anticipated warranted search, or "destroy evidence." [Doc. 328 at 3].[1] Cross testified he was also looking for weapons that could later be used. [Doc. 314 at 10].[2] This is almost identical to the situation presented in *Murray*. *See* 487 U.S. at 540 n.2. There the district court found the agents in that case warrantlessly entered the premises to "apprehend any participants" and otherwise "guard against" evidence destruction. *Id.* The Court went on to hold, "[w]hile they may have misjudged the sufficient exigent circumstances to justify warrantless entry … there is nothing to suggest that they went in

---

[1] Excerpt from Cross's Hearing Testimony:

Q – What I'm asking, I guess what I was asking was is before you did a protective sweep, did you have --- was it your plan to get a search warrant or no, did you feel like you needed to develop more information before you got a search warrant?

A – Our decision was to get a search warrant of the residence.

Q – Okay. And that was before you did the protective sweep?

A – That's correct.

[2] In *Murray*, the Court implied courts can give dispositive weight to uncontroverted police assurances that the unlawful search did not prompt their seeking a warrant. 487 U.S. at 540 n.2.

merely to see if there was anything worth getting a warrant for." *Id.* Here, Magistrate Judge Lee's finding in this regard satisfies this element.

Next the Court must determine whether the unlawful search tainted the subsequent warrant. *Murray* situations come in two flavors. First are those like *Murray*, where the law enforcement officers omit any mention of their previous unlawful search or its results in their warrant affidavit. *Id.* at 536. Those are the easy cases. If the warrant is sufficient, the evidence is admissible. This is because the unlawful search cannot be said to have tainted the search warrant because there was no information related to the unlawful search that served as a basis for the magistrate's probable cause determination.

Things are more difficult in cases like this one, where the officers' affidavit references and cites their unlawful search and what they discovered during it. The concern in these situations is that information from the unlawful search may have influenced or tainted the magistrate's probable cause determination. On this issue, however, the Court is not venturing onto untrodden ground. The Sixth Circuit has provided guidance about how to address the issue. *See United States v. Jenkins*, 396 F.3d 751 (6th Cir. 2005).

When presented with a search conducted pursuant to a warrant, which was based on a sworn affidavit containing information collected as part of a prior unlawful search, courts are not permitted to simply discard the fruits of the lawful search. *Id.* The Sixth Circuit requires, instead, that the portions of the affidavit that contain unlawfully obtained information be excised. *Id.* at 758. The Court is instructed to then read the excised affidavit and determine whether it still supports a probable cause finding. *Id.* If so, the search was valid and its resulting evidence is admissible at trial. This rule

comports with *Murray*'s reasoning, which seeks to put the government in the *same* position it would have been without the illegal search, if possible, and not a worse position. *Id.* In other words, without the unlawful information in the affidavit, the government does not benefit from its constitutional violation.

B.  **Probable Cause** - **Warrant Affidavit**

Reviewing the excised affidavit, the Court finds it contains sufficient information to determine probable cause for a warrant. To repeat, that affidavit reads as follows:

> On January 25, 2017 Agents received information that Scott Rounsaville was dealing a large amount of "ICE" methamphetamine. Agents came to the residence to conduct a follow up investigation. Agents knocked on the front door of the residence and a white male later known as Johnathan Smith came to the door. Agents noticed a strong odor consistent with marijuana; Smith shut the door behind him as he stepped out onto the porch. Smith told Agents that Rounsaville was not there but that he would be back shortly. Smith also advised that he did not live at the residence, and that he lived in Chickamauga. Agents secured the residence for a search warrant. While securing the residence, Commander Doyle looked underneath the bed for persons still inside the residence and located a large clear plastic tote full of suspected "ICE" methamphetamine. For the above reasons, Affiant has probable cause to believe that there is now contained Marijuana and methamphetamine, on the premises, vehicle, and/or persons described above.

[Doc. 285-1]. The portion to be excised from this statement is the second to last sentence, which reads: "While securing the residence, Commander Doyle looked underneath the bed for persons still inside the residence and located a large clear plastic tot full of suspected 'ICE' methamphetamine." The question is, with that sentence removed, whether what is left supports probable cause. To summarize, the excised affidavit contains two noteworthy facts: (1) an anonymous informant's report that Defendant was selling "large amounts" of methamphetamine and (2) that officers

9

smelled a strong odor "consistent with marijuana" while at his residence. Without the excised information, the anonymous tip about Defendant selling "large amounts" methamphetamine is left uncorroborated, and there is otherwise no information showing the anonymous informant was reliable or his tip credible. Further there is no nexus between the tip and the smell of marijuana at Defendant's home. While the tip may not be entirely irrelevant, standing alone it cannot support probable cause. What the Court is left with is that, "Agents noticed a strong odor consistent with marijuana" at Defendant's residence. Magistrate Judge Lee held that fact standing alone supported probable clause. The Court agrees.

To explain why, it is important to remember the purpose of warrants. The warrant requirement places a check on otherwise unrestrained police activity by "requiring that [the usual inferences which reasonable men draw from evidence] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in that often competitive enterprise of ferreting out crime." *Illinois v. Gates*, 462 U.S. 213, 240 (1983) (quoting *Johnson v. United States*, 333 U.S. 10, 68 (1948)). The Fourth Amendment commands "no warrant shall issue but upon probable cause." U.S. Const. amend. IV. Probable cause, however, is not an insurmountable barrier; it does not require near or absolute certainty, only a probability. *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008). More particularly, a search warrant is supported by probable cause when a magistrate can reasonably find there is a "fair probability" evidence of a crime will be located at the premises to be searched. *United States v. Fraizer*, 423 F.3d 526, 531 (6th Cir. 2005).

To ensure magistrates are not abdicating their constitutional duties, courts "conscientiously review the sufficiency of affidavits on which warrants [were] issued."

*Gates*, 462 U.S. at 239. The Court's duty in reviewing is "simply to ensure" there was a "substantial basis" supporting the conclusion of probable cause. *Id.* at 238. When determining whether a warrant was supported by probable cause, the Court's review is limited to the four corners of the warrant's supporting affidavit. *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006). The Court is instructed to give "great deference" to the issuing magistrate's conclusions. *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000). It is not permitted to second guess the magistrate; in other words, a magistrate's probable cause determination is afforded more latitude than a de novo review might. *Gates*, 462 U.S. at 236. The review should avoid a "grudging or negative attitude." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). A court should only overrule a magistrate's determination if the supporting affidavit, when read as a whole in a "realistic and common sense manner," fails to allege facts that would support a reasonable conclusion of probable cause. *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1991).

The smell of marijuana, standing alone, supports a finding of probable cause. That rule has been long established and repeatedly upheld, but in this Circuit it has only been applied in the context of vehicle searches. *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) ("smelling marijuana ... constituted probable cause to believe that there was marijuana in the vehicle"); *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004) (same). The issue in this case is whether to extrapolate that principle to home searches. The Supreme Court has held an "odor" that is "sufficiently distinctive to identify a forbidden substance ... might very well be ... evidence of the most persuasive character." *Johnson v. United States*, 333 U.S. 10, 13 (1948). "If the presence of [such]

orders is testified to before a magistrate and he finds the affiant qualified to know the odor ... this Court has never held such a basis insufficient to justify issuance of a search warrant." *Id.* Since the Supreme Court has held the question open, the lower courts have stepped in and addressed the issue.

The Sixth Circuit has indicated, albeit in dicta, that it "may be true" the smell of marijuana standing alone supports probable cause to search a home. *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002); *United States v. Yarbrough*, 272 F. App'x 438, 443 (6th Cir. 2007) (same) (citing *Elkins*). The Sixth Circuit is not alone in that conclusion. A majority of courts are in accord, holding the same. *United States v. Correa*, 347 F. App'x 541, 545 (11th Cir. 2009) ("The marijuana the agents smelled emanating from inside the houses provided probable cause to request and to issue the search warrants"); *United States v. Garcia-Zambrano*, 530 F.3d 1249, 1260 (10th Cir. 2008) (holding "frequent observations of the smell of burning marijuana coming from Defendant's apartment, verified on four separate occasions by a trained police officer ... was sufficient to support a finding of probable cause" to issue a warrant); *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); *United States v. McKeever*, 906 F.2d 129, 132 (5th Cir. 1990) ("Distinctive odors, detected by those qualified to know them, may alone establish probable cause" for a search warrant); *State v. Watts*, 801 N.W.2d 845, 854 (Iowa 2011) (holding the smell of marijuana in an apartment hallway which became "overpowering" after defendant opened his apartment door "provided probable cause for issuance of the warrant"); *Gompf v. State*, 120 P.3d 980, 986 (Wyo. 2005) (holding the smell of marijuana while

lawfully inside a home in a common area supported "probable cause to justify the issuance of the search warrant"); *State v. Beeken*, 585 N.W.2d 885, 449 (Neb. 1998) (holding "the smell of burning marijuana by a qualified person" supports probable cause to obtain a warrant); *State v. Rein*, 923 P.2d 639, 640 (Or. 1996) (holding, after excising unlawfully obtained evidence from affidavit, the smell of marijuana standing alone was sufficient evidence to support probable cause); *State v. Arpin*, 448 A.2d 1334, 1340 (Conn. 1982) (holding the smell of marijuana emanating from packages delivered to a home supported probable cause to issue a warrant); *see also United States v. Kerr*, 876 F.2d 1440, 1444 (9th Cir. 1989) ("By far the most incriminating piece of evidence was the odor of marijuana emanating from [defendant's] premises."); *but see State v. Huff*, 92 P.3d 604, 610–11 (Kan. 2004) (holding because it was unsettled under Kansas law whether the smell of marijuana standing alone supported probable cause, such evidence "would not have guaranteed issuance of a warrant").

Defendant argues that the Court should depart from the majority rule and not extend the plain smell doctrine to the search of homes because under the law the home is afforded more protections than vehicles. And Defendant is correct, homes are afforded more protection under the law, but that increased protection is found in the Constitution's warrant requirement, not a special, heightened version of the probable cause standard. In other words, the primary difference between the two situations, home versus vehicle searches, is *who* gets to make the probable cause determination, not *what* constitutes probable cause.

In the context of vehicles, due in large part to their mobility, police officers have the authority to unilaterally decide whether they have sufficient probable cause to conduct a search of a vehicle. *See Carroll v. United States*, 267 U.S. 132 (1925). In the

context of homes, on the other hand, a warrant is required, which puts the probable cause determination in the hands of a neutral and detached magistrate, rather than the police acting alone. It is not the case that the probable cause calculus somehow changes or is subject to a higher standard in the warrant context. Probable cause is probable cause, and Defendant has not proffered a logical distinction as to why that standard is different for home searches than it is for vehicles. Accordingly, Defendant's objections are overruled.

Defendant avers, even if the smell of marijuana supports probable cause standing alone, the affidavit here does not adequately demonstrate the "agents" were familiar with the smell of marijuana. However, the weight of the law is against Defendant's argument. If one reads an affidavit in a realistic and common sense fashion, "inherent in [an] officer's statement that he smelled marihuana" is that he is "familiar with that substance's odor." *United States v. Ludwig*, 508 F.2d 140, 142 (10th Cir. 1974); *see also United States v. Talley*, 692 F. App'x 219, 222 (6th Cir. 2017) (holding the panel was not aware of any case law that required "an officer to attest that he has specialized training in detecting marijuana's order before" his claims that he smelled it are given weight); *United States v. Carr*, 92 F.Supp.2d 1137, 1141 (D. Kan. 2000) (holding officer's affidavit claiming he smelled marijuana emanating from defendant's apartment supported probable cause for a warrant, even though the affiant did not attest to his training or experience with the smell of marijuana).

### C. Cross's Credibility

Next, Defendant raises objections to Magistrate Judge Lee's credibility determinations regarding Cross's testimony. Defendant raises two primary objections. First he doubts Cross and the other agents actually smelled marijuana at the door to his

residence, and next he challenges Cross testimony that he went to the Defendant's house merely to "knock and talk" and that there was a decision to obtain a warrant prior to the unlawful sweep. [Doc. 337 at 13–15].

Magistrate Judge Lee's credibility findings were made after witnessing Cross's testimony first-hand, while this Court's review is based on briefings and a transcript of the hearing.

> Courts are instructed to be "sensitive to the problems of making ... determinations on the cold record." *United States v. Raddatz*, 447 U.S. 667, 669 (1980). A written transcript of a hearing does not "convey the evidence fully in its most important elements ... It cannot give the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration ..." *Id.* (quoting *Queen v. Bertrand*, 16 Eng. Rep. 391, 399 (1867)). In most cases, a magistrate judge's credibility determinations based on in-person testimony should not be overturned until the district judge concludes they are incorrect after conducting a second hearing. *United States v. Johnson*, 631 F. App'x. 299, 301 n.1 (6th Cir. 2015). In order to ensure efficient case resolution and prevent duplicative efforts, a magistrate judge's credibility determinations reached after conducting a hearing are afforded deference unless it appears the findings are clearly erroneous or the testimony is irreconcilably inconsistent with the established record. *Raddatz*, 447 U.S. at 684 ("[I]n providing for 'de novo determination' rather than de novo hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed finding and recommendations.").

*United States v. Melton*, No. 1:17-CR-69, 2017 WL 6343794, at *6 (E.D. Tenn. Dec. 12, 2017). Here, Magistrate Judge Lee's determinations were neither "clearly erroneous" nor "irreconcilably inconsistent" with the record. *Id.* As such, they will be affirmed. The Court will, in any event, briefly address Defendant's objections to the credibility findings regarding the smell of marijuana.

Defendant claims Cross's testimony regarding his ability to smell marijuana at his residence is unsupported by the record. According to Defendant, there was no way Cross

and Doyle could have smelled the marijuana found in his house because it "was packaged in a way that would limit its exposure to the air" due to it being "minimally contained within two plastic containers with closed lids." [Doc. 337 at 14]. On the other hand, agents found nearly one pound of marijuana positioned next to Defendant's front door, where Cross and Doyle would have been standing at the time they claimed to have smelled the substance.[3] Given that fact, the record bolsters Cross's testimony, and the evidence is hardly inconsistent with Magistrate Judge Lee's finding. Defendant's credibility objections are overruled.

### D. Good Faith

Because the Court finds the warrant at issue here was supported by probable cause when based on the excised affidavit, the good faith issue does not need to be addressed any further than it already has been by the Magistrate Judge. Magistrate Judge Lee's finding regarding good faith is well-reasoned, and the Court expressly adopts her reasoning and finds Cross and the other agents reasonably relied on the search warrant in good faith, even if it was defective.

## III. CONCLUSIONS

For the reasons stated herein:

- Defendant's Objections, [Doc. 337], are **OVERRULED**;
- Magistrate Judge Lee's Report and Recommendations, [Doc. 328], is **ACCEPTED and ADOPTED**; and
- Defendant's Motion to Suppress, [Doc. 283], is hereby **DENIED**.

---

[3] The marijuana may or may not have been Defendant's. That is irrelevant, however, for the Court's purposes here. The issue is whether Doyle and Cross are telling the truth regarding whether they smelled marijuana at Defendant's home. The discovery of large amounts of marijuana there bolsters their claim. In any event, search warrants are directed at places, not persons. *United States v. Kahn*, 415 U.S. 143, 155 n.15 (1974). Given that, their claim supported probable cause even if the marijuana was not Defendant's.

**SO ORDERED** this 10th day of October, 2018

                                          */s/ Harry S. Mattice, Jr.*
                                          HARRY S. MATTICE, JR.
                                          UNITED STATES DISTRICT JUDGE